UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL PHILLIPS,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

Case No. 3:10-cv-05285-BHS-KLS

REPORT AND RECOMMENDATION

Noted for May 20, 2011

Plaintiff has brought this matter for judicial review of defendant's denial of his application for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review, recommending that for the reasons set forth below, defendant's decision to deny benefits should be reversed and this matter should be remanded for further administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

On April 18, 2005, plaintiff filed an application for SSI benefits, alleging disability as of November 20, 2004, due to seizures, brain damage and degenerative disc disease. See Tr. 21, 98,

REPORT AND RECOMMENDATION - 1

128.  His application was denied upon initial administrative review and on reconsideration.  See Tr. 21, 70, 76.  On February 25, 2008, a hearing was held before an administrative law judge, at which plaintiff, represented by counsel, appeared and testified, and at which a vocational expert appeared, but did not testify.  See Tr. 665-91.

On May 13, 2008, the ALJ issued a decision in which plaintiff was determined to be not disabled.  See Tr. 403-14.  On September 17, 2008, plaintiff's request for review of the ALJ's decision was granted by the Appeals Council, which vacated that decision and remanded the matter for further administrative proceedings.  See Tr. 419-20.  On July 16, 2009, another hearing was held in regard to plaintiff's application before the same ALJ, at which plaintiff, again represented by counsel, appeared and testified, and once more at which a vocational expert also appeared but did not testify.  See Tr. 692-99.

On September 22, 2009, the ALJ issued a second decision in which he still determined plaintiff to be not disabled.  See Tr. 21-37.  Plaintiff's request for review of that decision was denied by the Appeals Council on February 23, 2010, making the ALJ's decision defendant's final decision.  See Tr. 7; see also 20 C.F.R. § 416.1481.  On April 24, 2010, plaintiff filed a complaint in this Court seeking judicial review of defendant's decision.  See ECF #1-#4.  The administrative record was filed with the Court on September 15, 2010.  See ECF #11.  The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1) in not finding his depressive disorder and seizure disorder were severe impairments; (2) in evaluating the medical and non-medical evidence in the record; and (3) in finding him to be capable of performing other jobs existing in significant numbers in the national economy.

REPORT AND RECOMMENDATION - 2

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to defendant for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. <u>See</u> <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance. <u>See</u> <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. <u>See</u> <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.      <u>The ALJ's Step Two Determination</u>

At step two of the sequential disability evaluation process,[1] the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); <u>see</u> <u>also</u> Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

---

[1] Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. <u>See</u> 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. <u>See</u> <u>id.</u>

REPORT AND RECOMMENDATION - 3

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. See Smolen, 80 F.3d at 1290.

A.      Depressive Disorder

In regard to plaintiff's depressive disorder the ALJ found in relevant part at step two of the sequential disability evaluation process as follows:

> . . . [T]he claimant is limited primarily by a personality disorder and marijuana abuse and he does not have an affective disorder or anxiety disorder which is severe. In making this assessment, I have given great weight to the opinion of [examining psychiatrist] Dr. [Beal] Essink[, M.D.,] that the claimant's depressive symptoms are most likely secondary to his ongoing cannabis dependence. Dr. Essink further opined that a more precise classification of the claimant's anxiety and depressive symptoms was not possible in light of his ongoing cannabis dependence. (Exhibit C-7F). The record reveals the claimant has reported a decrease in symptoms of depression and anxiety with prescribed medication. [Examining psychologist] Dr. [Robert E.] Schneider[, Ph.D.,] did not diagnose the claimant with an affective disorder in March 2009 and the claimant reported his symptoms of anxiety were also helped with marijuana. (Exhibit C-27F/349, 351).

Tr. 28. Plaintiff argues the substantial evidence does not support the ALJ's determination here, asserting specifically that the ALJ mischaracterized Dr. Essink's opinion.

The undersigned agrees the ALJ's statement that Dr. Essink found plaintiff's depressive symptoms to be most likely secondary to his ongoing cannabis abuse and opined that it was not possible to give a more precise classification of those symptoms, is not an accurate reflection of

REPORT AND RECOMMENDATION - 4

what Dr. Essink actually concluded in his report.  At the time, Dr. Essink stated in relevant part that:

> . . . He does appear quite depressed . . . during the course of our interview, but his history *is confounded* by daily use of Cannabis.  The claimant's symptoms are probably best described as a . . . *Major Depressive Disorder*, although his depressive symptoms *could be tied into* his ongoing Cannabis Dependence, so I feel *Depressive Disorder Non Otherwise Specified is the most accurate diagnosis at this time*. . . .

Tr. 273 (emphasis added).  Thus, the undersigned agrees with plaintiff while Dr. Essink felt that cannabis abuse "tied into" or "confounded" plaintiff's depressive symptoms – and therefore that abuse certainly could significantly affect those symptoms – he clearly believed plaintiff to have an underlying depressive disorder.

On the other hand, the undersigned does not find the ALJ necessarily erred in noting that Dr. Schneider did not provide a formal diagnosis of depression when he evaluated plaintiff some four and a half years later. See Tr. 535.  Dr. Schneider did comment in his evaluation report that plaintiff's presentation indicated the presence of "very significant depression" that would require "aggressive treatment." Tr. 527, 529, 533, 535.  But because sole responsibility for determining credibility and resolving ambiguities and conflicts in the medical evidence lies with the ALJ, and because the undersigned cannot say the ALJ's reliance on the fact that Dr. Schneider chose not to formally diagnose plaintiff with depression as representative of Dr. Schneider's final conclusion in regard to this issue despite the latter's presentation, the determination of the ALJ here must be upheld. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); see also Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982); Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999).  Where the opinion of an examining physician is based on independent clinical findings, furthermore, the ALJ has the discretion to disregard the conflicting opinion in another examining physician's diagnosis, in this case Dr. Essink's. See Saelee v. Chater, 94 F.3d

REPORT AND RECOMMENDATION - 5

520, 522 (9th Cir. 1996).

The ALJ's determination that plaintiff did not have a severe depressive disorder based on "a decrease in symptoms of depression . . . with prescribed medication" is supported by the weight of the medical evidence as well. Tr. 28; see also Tr. 437 (depressive disorder "currently resolved"), 441 (medications "helpful"), 442 (medications taken "for several months now with fairly good results"), 468 (depression somewhat better during past week), 469 (more upbeat, relaxed and optimistic; depression not as bad as previous week), 471 (medications seemed to be working, indicating awareness of experiencing fewer symptoms), 472 (in energetic and very positive mood; very upbeat, excited and motivated; " loved life"), 474 (more positive and hopeful; feeling "pretty good"), 477-78 (doing "OK"), 480 (more optimistic, hopeful, relaxed, calm and focused; everything was "fine" in his head), 481 ("seemed more hopeful"); 506 (optimistic and less fatigued and lethargic). Thus, while the record indicates plaintiff continued to experience depressive symptoms at times (see Tr. 470, 473, 476, 500-01, 504), again the ALJ did not err in resolving any conflicts here by finding plaintiff had no severe depressive disorder, as the substantial evidence in the record, as just seen, supports a finding of overall improvement in his symptoms on medication.

B.   Seizure Disorder

Plaintiff also argues the ALJ erred in finding he did not have a severe seizure disorder.  In regard to that disorder, the ALJ found at step two that:

> The claimant has alleged that seizures contribute to his disability.  He reported a history of a motorcycle accident and head trauma on February 22, 1987.  He has also alleged he has experienced seizures since that time which occur everyday, last a few seconds, and cause him to be unable to move (Exhibit 3E).  On December 19, 1997, the claimant presented to neurologist Paul L. Jacobsen, M.D., complaining of "freezing up" under stress.  Dr. Jacobsen opined that these were small panic attacks, but nonetheless ordered a CT scan and EEG.  The EEG was negative, but the CT scan revealed post-traumatic

REPORT AND RECOMMENDATION - 6

encephalomalacia with gliosis, leading Dr. Jacobsen to diagnose the claimant with probable seizure disorder (B-9F and B-15F).  There is no indication he was treated for seizures and during a session with psychiatrist Abraham P. Perlstein, M.D., on February 5, 1999, he denied having seizures (Exhibit B-1F).  During psychiatric evaluation in September 2005, the claimant reported he experienced panic attacks that "might be seizures" (Exhibit C-7F/129).  Medical records dated January 9, 2008, reveal the claimant reported to William S. Herzberg, M.D., that he experienced a seizure with loss of consciousness two days previously.  Dr. Herzberg reported that brain imaging demonstrated bifrontal encephalomalacia and he had previously been on Dilantin although the claimant reported he had used anticonvulsants for years.  Dr. Herzberg prescribed Gabapentin for seizure control and also reported the medication might help with pain relief. (Exhibit C-18F/258).  EEG performed on January 29, 2008, was normal (Exhibit C-24F/310).  On February 13, 2008, Dr. Herzberg reported that Neurontin had resulted in decreased seizure frequency from two per day to about two every month with minimal sedation and it was also helping pain control. (Exhibit C-24F/312).  The claimant sought emergency medical services after a fall on May 22, 2008, which was possibly related to a seizure.  He reported he had not had a seizure "for a while" (Exhibit C-25F/318).  However, CT scan of the head was normal.  He was discharged to home that date in stable condition. (Exhibit C-25F).  On May 27, 2008, Dr. Herzberg reported that the claimant had a seizure disorder which was responding to Neurontin.  However, he opined that the claimant's episode in May 2008 was likely a seizure. (Exhibit C-24F/313).  On July 2, 2008, Michael C. Liu, M.D., reported that the claimant reported a fall injury because of a seizure which occurred approximately 1½ months previously for which he sought treatment with John Nusser, M.D. (Exhibit C-30/402).  Dr. Lui reported that although the claimant was vague regarding his history of seizure disorder, he reported good response to Neurontin.  He also noted that the claimant generally had not had breakthrough seizures. (Exhibit C-30F/400-401).  More recently Dr. Herzberg reported on January 15, 2009, that the claimant has a seizure disorder which was responding to Keppra.  He reported the claimant had no significant weight change since his last visit on November 24, 2008, and he would like the claimant to work on weight loss. (Exhibit C-28F/360).  The claimant reported to Dr. Schneider in March 2009 that he continued to drive and was a safe driver (Exhibit C-27F/358).  There is no indication that he complained of seizures to Dr. Schneider during that evaluation.  Medical records dated June 12, 2009, reveal the claimant reported falling after he "coughed and then had a seizure".  He was treated for forehead laceration which required sutures. (Exhibit C-29F).  However, it is noted that a similar episode in June 2007 was associated with a vagal reaction, rather than seizure (Exhibit C-30F/376).  Accordingly, the record suggests that the claimant's seizures are adequately controlled with prescribed medication and do not result in more than minimal limitations in his ability to perform work-related tasks and do not result in a severe impairment.

REPORT AND RECOMMENDATION - 7

Tr. 26.

Although plaintiff argues his seizures do have more than a minimal impact on his ability to perform work-related limitations, the objective medical evidence in the record, as pointed out by the ALJ above, demonstrates otherwise. See Tr. 214, 398, 436-37, 486, 491-92, 538-39, 586, 618-19, 624, 638.  Plaintiff goes on to note, however, that his vocational rehabilitation counselor, Monika G. Robertson, stated in early July, 2009, that his case was being closed at that time "due to the severity of his health issues," that the "last injury" he suffered had revealed "safety issues, especially as [they] relate[d] to work," and that she had been "compelled to support [his] social security application to ensure ongoing support for [his] health and mental health issues." Tr. 432, 434.  But the injury referred to by Ms. Robertson appears not to have been due to experiencing a seizure, but to "a coughing attack" caused by plaintiff's chronic obstructive pulmonary disease ("COPD"). See Tr. 431-32, 434.  Indeed, no actual mention of plaintiff's seizures or of a seizure disorder was made by Ms. Robertson.[2] See id.

II.   The ALJ's Evaluation of the Medical Evidence in the Record

As noted above, it is the ALJ who is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick, 157 F.3d at 722.  Thus, where the objective medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample, 694 F.2d at 642.  In such cases, "the ALJ's conclusion must be upheld." Morgan, 169 F.3d at 601.  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and

---

[2] The undersigned further notes that at step two of the sequential disability evaluation process, the ALJ's severity determination is made solely on the basis of objective medical evidence. See SSR 85-28, 1985 WL 56856 *4 ("At the second step of sequential evaluation . . . medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.").  As such, because Ms. Robertson is not a medical source, the ALJ was not required to consider her opinions at step two.

REPORT AND RECOMMENDATION - 8

whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. See Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v.

1   Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.

2   2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a

3   nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

4   constitute substantial evidence if "it is consistent with other independent evidence in the record."

5   Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

6          A.      Dr. Nusser

7          Plaintiff argues the ALJ erred in not giving proper weight to the opinions of Dr. Nusser,

8   his primary care physician.  With respect to those opinions, the ALJ found as follows:

9

10         I have considered the May 2007 opinion of treating physician John Nusser,
           M.D., that the claimant's impairments limit him to no more than sedentary
11         work and his February 2008 opinion that the claimant is unable to sustain
           even sedentary work on a regular, full-time basis (Exhibits C-14F and C-17F).
12         However, those opinions are given little weight.  In May 2007, Dr. Nusser
           reported that the claimant's physical impairments (diabetes, COPD, and low
13         back pain) were of "mild" to "moderate" severity.  He also indicated that the
           severity of the claimant's low back pain was based on his subjective reports.
14         He reported no objective findings which would be consistent with a limitation
           to sedentary work.  He further reported the claimant was primarily limited by
15         mental impairments, particularly an anxiety disorder. (Exhibit C-14F).  Dr.
           Nusser also reported no objective findings to support his February 2008
16         opinion.  It is thus concluded that the limitations he has attributed to physical
           impairments are based primarily on the subjective reports of the claimant.
17         Those extreme limitations are not supported by the objective evidence of
           record.  Although Dr. Nusser has reported that the claimant's seizures are
18         poorly controlled, his own records reveal an assessment of "questionable
           history of seizures" on December 12, 2007 (Exhibit C-17F/250).  Dr.
19         Herzberg reported on January 15, 2009, that the claimant's seizure disorder
           was responding to Keppra (Exhibit C-28F/360).  Likewise, the severe
20         limitations Dr. Nusser has attributed to neuropathy are not documented.  The
           records also reveal the claimant's COPD is only of "mild" severity and is
21         adequately controlled with medication. (Exhibits C-30F/370, 479).  Dr.
           Nusser again reported that the claimant is limited primarily by mental
22         impairments associated with his history of frontal lobe damage which he
           reported results in difficulty following commands.  Dr. Nusser opined that the
23         claimant's mental impairments would result in a "very, very low" likelihood
           of gainful employment.  However, Dr. Nusser's opinions regarding the
24         severity of the claimant's mental impairments and their effect on his ability to
           sustain employment is outside the area of his expertise.  There is no indication
25

26

REPORT AND RECOMMENDATION - 10

that Dr. Nusser has training as a psychologist, a psychiatrist, or a vocational specialist. His opinion is also inconsistent with other evidence of record. Although his insight and judgment were noted to be limited, the claimant performed well on mental status examination performed in September 2005 by Dr. Essink. The claimant told Dr. Essink that he engaged in playing video games as a hobby. (Exhibit C-7F/125). Dr. Schneider reported that the claimant demonstrated adequate reasoning, judgment, analytical skills, and intellectual problem solving during evaluation in March 2009. (Exhibit C-27F/351).

Dr. Nusser reported in May 2007 that the claimant "may have antisocial personality disorder" which might result in difficulty with mental health therapy and difficulty working in a social environment (Exhibit C-30F/374). However, that opinion is given little weight. Although the claimant professes that he does not like people, mental health treatment records reveal no difficulties working with his therapists. After a recent evaluation in March 2009, Dr. Schneider did not report that the claimant had any significant deficits in work-related social functioning (Exhibit C-27F).

Tr. 34-35.

Plaintiff does not challenge the ALJ's rejection of those aspects of Dr. Nusser's opinions dealing with his physical impairments and limitations, but alleges the ALJ gave no valid reasons for rejecting the opinions concerning his mental impairments and limitations. The undersigned agrees, and defendant concedes, that the fact that Dr. Nusser is not a psychiatrist or psychologist does not by itself constitute a proper basis upon which to reject his opinions regarding plaintiff's mental impairments and limitations. See Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (rejecting assumption that psychiatric evidence must be offered by board-certified psychiatrist, as under general principles of evidence law, primary care physician was qualified to give medical opinion on claimant's mental state as it related to her physical disability).

On the other hand, the ALJ did not err in giving more weight to the contrary findings of Drs. Essink and Schneider, who are specialists in the field of psychopathology, over those of Dr. Nusser. See Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (more deference given to opinion of specialist about medical issues relating to area of specialty); see also Batson, 359 F.3d

REPORT AND RECOMMENDATION - 11

at 1195 (ALJ need not accept treating physician opinion if it is inadequately supported by record as whole); Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.  As such, the ALJ did set forth a clear and convincing basis for rejecting Dr. Nusser's opinions here, even though, he erred as discussed above, in his characterization of Dr. Essink's report regarding depression at step two of the sequential disability evaluation process.

B.    Dr. Schneider

In regard to the findings and opinions of Dr. Schneider, the ALJ found in relevant part:

> The claimant's allegations of significant cognitive impairment are not supported by the report of Dr. Schneider.  Results of Wechsler Adult Intelligence Scale-III (WAIS-III) testing were consistent with intellectual functioning in the average range. (Exhibit C-27F/355).  Dr. Schneider reported that results of the Wechsler Memory Scale III (WMS III) which were in the average range were not consistent with the level of memory impairment alleged by the claimant.  However, he did demonstrate difficulty recalling details of two stories on the measure of immediate recall. (Exhibit C-27F/353).  Dr. Schneider reported that the claimant demonstrated adequate reasoning, judgment, analytical skills, and intellectual problem solving during evaluation in March 2009. (Exhibit C-27F/351).  Dr. Schneider concluded that although the claimant would likely be unsuitable for traditional job training programs, he was able to learn through experiential training; he would likely require repetition and rehearsal because of memory problems; and he requires continued mental health treatment. (Exhibit C-27F/439-350).  I have given little weight to the March 2009 opinion of Dr. Schneider regarding a global assessment of functioning (GAF) score of 45 (serious symptoms). [3]  There is no indication that [D]r. Schneider had the opportunity to review any of the claimant's medical or mental health treatment records.  He also appeared to uncritically accept the claimant's myriad complaints despite MMPI-2 results which were invalid due to over-reporting of symptoms. (Exhibit C-27F/352).  Although his report suggests the claimant is limited by symptoms of depression, he did not report a diagnosis of a depressive disorder.  The claimant reported during the evaluation that he was taking Clonazepam for

---

[3]  A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000)) at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) (GAF score in forties may be associated with serious impairment in occupational functioning)

REPORT AND RECOMMENDATION - 12

anxiety and mental health treatment records suggest that his symptoms of anxiety are adequately controlled with prescribed medication.  In addition, Dr. Schneider's report suggests that the claimant remains capable of engaging in some types of employment.

Tr. 32-33.  Plaintiff argues the ALJ failed to give valid reasons for discounting Dr. Schneider's opinion here.  As explained below, while many of the reasons the ALJ gave for discounting that opinion were not valid, overall the ALJ did not err in discounting it.

First, plaintiff is correct in asserting that Dr. Schneider was not required to have reviewed any medical or mental health treatment records before he could issue his opinion, given that he is an examining physician, the very definition of which is a physician who bases his or her opinion on his or her own examination of the claimant.  Nor does the ALJ state what records he believes contradict Dr. Schneider's findings and conclusions.  It also does not appear that Dr. Schneider "uncritically" accepted plaintiff's complaints, given that he conducted a mental health status examination, recorded his own personal observations of plaintiff and performed psychological testing as well.  See Tr. 525-35; see also Sprague, 812 F.2d at 1232 (opinion based on clinical observations supporting diagnosis of depression is competent psychiatric evidence); Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) (when mental illness is basis of disability claim, objective medical evidence may consist of diagnoses and observations of professionals trained in field of psychopathology); Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (results of mental status examination provide basis for psychiatric diagnosis, just as physical examination results provide basis for diagnosis of physical illness or injury).

In addition, it is not at all clear that the psychological testing Dr. Schneider performed at the time definitively indicated over-reporting of symptoms by plaintiff.  Specifically in regard to that portion of the psychological testing, Dr. Schneider stated in relevant part that although the profile generated by plaintiff was "technically invalid due to what could be considered over

REPORT AND RECOMMENDATION - 13

reporting," he also experienced "himself as extremely impaired and present[ed] himself accordingly on [that testing]." Tr. 532.  In other words, the over reporting may have been due to what plaintiff felt he was experiencing at the time, rather than to a conscious intention to present himself in a light that was worse than what he himself believed to be true.

As discussed above, however, the record supports the ALJ's determination that plaintiff's depressive symptoms improved on prescribed medication.  The substantial evidence in the record supports the ALJ's determination that plaintiff's anxiety symptoms were "adequately controlled with prescribed medication" as well, and that they "were also helped with marijuana." Tr. 28, 32-33; see also Tr. 437 (Lorazepam helped him be out in public without "overwhelming anxiety"; Effexor helped mood and anxiety, resulting in improved anxiety), 441 (medications, including Effexor, helpful), 442 (took medications, including Effexor, for several months with fairly good results), 446 (marijuana "calms me[]down and helps me focus"), 459 (anxiety "[f]airly well controlled," despite "quite bothersome" side effects), 480 (more relaxed and calm), 507 (mood better anxiety-wise), 511-12 (anxiety resolved on Effexor if he remains at home), 514 (Effexor and other medications "helpful"), 554 ("He has done well with clonazepam and this helps him maintain function and interactions."), 578 (Clonazepam "quite helpful"), 579 ("There may be an exacerbation related to discontinuing his marijuana."), 603 ("okay control" with Effexor and Xanax), 647 ("anxiety is 80% better"; "much happier" on Effexor; improving anxiety disorder). Again, this is true despite evidence of some occasional outbreaks in his anxiety, and thus improvement in plaintiff's symptoms is a valid reason for discounting Dr. Schneider's low GAF score. See Tr. 471, 481, 500, 648; see also Batson, 359 F.3d at 1195 (ALJ need not accept treating physician opinion if it is inadequately supported by record as whole); Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.

REPORT AND RECOMMENDATION - 14

In regard to vocational capabilities, Dr. Schneider also found in relevant part that:

. . . Since it is unlikely that he can perform any type of applied vocational activities because of his rotator cuff problems, back problems and carpel [sic] tunnel syndrome, *it appears more realistic to build upon his visual spatial abilities and his ability with numbers.* He demonstrated excellent facility with numbers. *He might be able to learn some type of auto damage estimation or some type of job bidding in any of the many construction related fields. Since he is familiar with auto body repair, this may be a natural area to build upon.*

Due to his lack of patience, he may not be a candidate for a traditional training program. *It is likely that he would learn best through experiential learning or, if possible, through on the job training.*

Tr. 534-35 (emphasis added). Thus, although Dr. Schneider noted elsewhere that plaintiff "was slow when performing almost all tasks which raise[d] serious concerns that he could perform any job at a competitive pace" (see Tr. 534), the undersigned cannot say it was unreasonable for the ALJ to find Dr. Schneider's statements regarding plaintiff's work background, capability with numbers and ability to learn to learn in other ways, to be suggestive of remaining capabilities for engaging in at least some types of employment. See Reddick, 157 F.3d at 722 (ALJ responsible for resolving conflicts and ambiguities in medical evidence); Sample, 694 F.2d at 642; Morgan, 169 F.3d at 601.

C.    Mr. Ryder

Finally, with respect to the medical evidence in the record, plaintiff takes issue with the ALJ's following findings:

I have also given little weight to the February 21, 2008, opinion of Brent Ryder, M.S., that the claimant's mental impairment is of a severity to meet standards of the Listing of Impairments (Exhibit C-16F). At the time Mr. Ryder gave that opinion, he had been treating the claimant only since November 16, 2007, a little over three months. His opinion is also inconsistent with the report of Dr. Essink and other evidence suggesting that the claimant is independent in performing activities of daily living, he has only mild limitations in social functioning and he retains the cognitive ability to perform at least unskilled work (Exhibits C-7F, C-3F). Mr. Ryder's opinion including his estimates of the claimant's GAF at 40 on May 30, 2008

REPORT AND RECOMMENDATION - 15

1
2
3
4
5
6
7
8
9
10

(Exhibit C-26F/343) and at discharge on July 15, 2008 (Exhibit C-26F/348),
are inconsistent with treatment records which reveal Mr. Ryder generally
described the claimant as presenting adequately groomed, demonstrating good
eye contact, and demonstrating thought process and judgment which were
adequate for effective communication. (Exhibits C-22F and C-26F).
Treatment records generally reflect the claimant's reports of dissatisfaction
with his relationship with his wife and with his life circumstances.  His
opinions are also inconsistent with medication records which reveal the
claimant's symptoms of depression and anxiety were improved with Effecor
XR and Lorazepam (Exhibit C-19F/272, 274).  On January 23, 2008, the
claimant was noted to be alert and oriented, and he rated his anxiety as low
and he rated his mood at 7 to 8 on a scale of 1 to 10, with 10 being the highest.
(Exhibit C-19F/274).  Medical records reveal the claimant has been prescribed
Clonazepam for symptoms of anxiety and Tanya M. Wilke, M.D., reported on
April 24, 2009, that the claimant had done well with that medication which
helps him maintain function and interactions. (Exhibit C-30F/465).

11
12
13
14
15

Tr. 35-36.  The undersigned agrees with plaintiff that the fact that Mr. Ryder had seen plaintiff

for only a little more than three months at the time he gave his opinion was not a valid reason for

rejecting that opinion, given that the ALJ failed to explain what amount of time is required for a

treating source to be qualified to give an opinion.  In any event, three months is much longer than

the one time evaluations upon which examining medical sources generally base their opinions.

16
17
18
19
20
21
22
23
24
25
26

On the other hand, the ALJ correctly noted that the low GAF score Mr. Ryder assessed is

at odds with the much less severe mental functional limitations found by Dr. Essink. See Tr. 273-

74; see also Batson, 359 F.3d at 1195 (ALJ need not accept opinion if inadequately supported by

record as whole); Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.  Also as noted by the

ALJ, it is fairly at odds with Mr. Ryder's own largely benign mental status findings. See Tr. 468-

81, 487-89, 500-01, 504, 506; Batson, 359 F.3d at 1195 (medical opinion need not be accepted if

inadequately supported by clinical findings); see also Bayliss v. Barnhart, 427 F.3d 1211, 1216

(9th Cir. 2005) (discrepancies between opinion source's functional assessment and that source's

clinical notes, recorded observations and other comments regarding claimant's capabilities is

clear and convincing reason for not relying on that assessment); Weetman v. Sullivan, 877 F.2d

REPORT AND RECOMMENDATION - 16

1   20, 23 (9th Cir. 1989).  In addition, as discussed above, the record supports the ALJ in finding

2   that plaintiff's symptoms of depression and anxiety both saw improvement as the result of him

3   taking his prescribed medications.

4   III.    The ALJ's Step Five Determination

5          If a disability determination "cannot be made on the basis of medical factors alone at step

6   three of the evaluation process," the ALJ must identify the claimant's "functional limitations and

7   restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p,

8   1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at

9   step four to determine whether he or she can do his or her past relevant work, and at step five to

10  determine whether he or she can do other work.  See id.  It thus is what the claimant "can still do

11  despite his or her limitations." Id.

12         A claimant's residual functional capacity is the maximum amount of work the claimant is

13  able to perform based on all of the relevant evidence in the record. See id.  However, an inability

14  to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ

15  must consider only those limitations and restrictions "attributable to medically determinable

16  impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the

17  claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be

18  accepted as consistent with the medical or other evidence." Id. at *7.

19         Here, the ALJ found plaintiff had the residual functional capacity to perform light work,

20  with the additional restrictions that he was limited to work that did not involve automobiles and

21  must avoid environmental conditions involving dust, fumes and the like, though he did retain the

22  ability to perform unskilled work. See Tr. 30-31.  Plaintiff argues this RFC assessment cannot be

23  upheld in light of the ALJ's errors in evaluating the medical evidence in the record.  However, as

REPORT AND RECOMMENDATION - 17

discussed above, the ALJ did not err in evaluating that evidence, and therefore there was no error in assessing plaintiff's residual functional capacity on that basis.

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). The Grids may be used if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in the original). That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in the original). If the claimant "has significant non-exertional impairments," however, reliance on the Grids is not appropriate.[4] Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).

In this case, the ALJ determined plaintiff to be capable of performing other jobs existing in significant numbers in the national economy at step five of the sequential disability evaluation process, finding specifically in relevant part that:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Guidelines rule 202.20 and rule 202.13. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule.

Tr. 37. Plaintiff first argues that because of the ALJ's errors in evaluating the medical evidence

---

[4] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

REPORT AND RECOMMENDATION - 18

1   in the record, and thus in assessing his residual functional capacity, he also erred in determining

2   him to be disabled at step five.  Again, however, the ALJ did not err in evaluating that evidence

3   or in assessing plaintiff's RFC, and thus he also did not err on that basis at this step.

4          Plaintiff goes on to argue that the limitation to not working with automobiles constitutes a

5   significant non-exertional limitation, thereby making the Grids inapplicable here.  But plaintiff

6   has not pointed to any legal authority or evidence in the record – nor could the undersigned find

7   any – establishing that such a limitation would have a significant impact on the number of jobs

8   existing in the national economy plaintiff could do.  Plaintiff also argues the limitation to "simple

9   tasks" assessed by two non-examining consultative psychiatrists in the record (see Tr. 170), and

10   given significant weight by the ALJ (see Tr. 34), preclude reliance on the Grids as well.  But

11   what the ALJ actually stated in his decision was that he agreed with those two psychiatrists that

12   the record showed plaintiff's mental impairments did "not prevent him from performing work

13   involving simple tasks," and thus that plaintiff remained "capable of performing the basic mental

14   activities generally required of unskilled work." Tr. 34.

15          The Grids, furthermore, "are directly premised on the availability of jobs at the unskilled

16   level," and "'reflect the potential occupational base of *unskilled* jobs for individuals who have

17   severe impairments which limit their exertional capacities. . . .'" Ortiz v. Secretary of Health and

18   Human Services, 890 F.2d 520, 526 (1st Cir. 1989) (quoting SSR 85-15, 1985 WL 56857 at *1

19   (emphasis added by court of appeals)).  As long as a non-exertional limitation is "substantially

20   consistent with the performance of the full range of unskilled work," therefore, the Grids retain

21   their "relevance and the need for vocational testimony is obviated." Id.  In addition, "[u]nskilled

22   work is work which needs little or no judgment to do *simple* duties that can be learned on the job

23   in a short period of time." SSR 83-10, 1983 WL 31251 *7 (emphasis added).  As such, the ALJ's

REPORT AND RECOMMENDATION - 19

1    limitation to simple, unskilled work falls within the purview of the Grids.

2          On the other hand, plaintiff correctly argues that the environmental limitations adopted

3    by the ALJ precludes reliance on the Grids.  See Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir.

4    1984) (noting that inability to tolerate dust or fumes is one example Grids give of environmental

5    restrictions not factored into Grid rules) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)).

6    As such, given this significant, non-exertional limitation, the ALJ was precluded from relying

7    solely on the Grids to find plaintiff not disabled at step five of the sequential disability evaluation

8    process, and instead should have obtained the testimony of a vocational expert on the impact

9    such a limitation would have on plaintiff's ability to work.  On this basis alone then, is remand

10   for further administrative proceedings warranted in this case.

11   IV.    This Matter Should Be Remanded for Further Administrative Proceedings

12          The Court may remand this case "either for additional evidence and findings or to award

13   benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the

14   proper course, except in rare circumstances, is to remand to the agency for additional

15   investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations

16   omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is

17   unable to perform gainful employment in the national economy," that "remand for an immediate

18   award of benefits is appropriate." Id.

19          Benefits may be awarded where "the record has been fully developed" and "further

20   administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan

21   v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded

22   where:

23           (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the
             claimant's] evidence, (2) there are no outstanding issues that must be resolved

REPORT AND RECOMMENDATION - 20

before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

Because issues remain in regard to plaintiff's ability to perform other jobs existing in significant numbers in the national economy at step five of the sequential disability evaluation process, this matter should be remanded to defendant for further administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the Court should find defendant improperly concluded plaintiff was not disabled. Accordingly, the Court should reverse defendant's decision and remand this matter for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **May 20, 2011**, as noted in the caption.

DATED this 4th day of May, 2011.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 21